```
             UNITED STATES DISTRICT COURT
               DISTRICT OF CONNECTICUT
```

| | | |
|---|---|---|
| **Westport Insurance** | : | |
| | : | |
| v. | : | No. 3:04cv1848 (JBA) |
| | : | |
| **St. Paul Fire and Marine** | : | |
| **Insurance Company and** | : | |
| **Carol Briggs** | : | |

**Ruling on Defendant's Motion to Dismiss [Doc. # 13]**

Defendant St. Paul Fire and Marine Insurance Company ("St. Paul") moves to dismiss the complaint of plaintiff Westport Insurance ("Westport") for failure to state a claim.  For the reasons that follow, defendant's motion is DENIED.

**I.   Background**

In this equitable subrogation action, Westport seeks reimbursement from St. Paul for the amounts it paid in defending and settling two lawsuits against Westport's and St. Paul's mutual insured, attorney Carole W. Briggs ("Briggs").  Briggs represented the Amity Regional School District No. 5 in litigation arising out of mold contamination in Amity Regional Senior High School, and was subjected to three malpractice lawsuits in connection with this representation.  The first suit was brought by Amity on or about October 26, 2001 ("Amity suit"), the second was brought by Heather Munro and Bruce Munro on or about January 13, 2003 ("Munro suit"), and the third was brought on or about January 25, 2003 by Kathryn Symonds, Kathy Scully,

1

Anna McDonnell and Cecilia Schuster ("Symonds suit").

Westport and St. Paul issued consecutive professional liability policies to Briggs.  St. Paul's policy was effective July 29, 2001 to July 29, 2002 on a claims made basis, see id. at ¶ 17, and Westport's policy was effective July 29, 2002 to July 29, 2003 on a claims made and reported basis, see Complaint [Doc. # 1] at ¶ 14.[1]  Westport's policy includes a provision for multiple insureds, claims, and claimants, stating:

> The inclusion of more than one INSURED in any CLAIM or the making of CLAIMS by more than one person or organization shall not increase the limits of liability or the deductible.  Two or more CLAIMS arising out of a single WRONGFUL ACT, as defined in each of the attached COVERAGE UNITS, or a series of related or continuing WRONGFUL ACTS, shall be a single CLAIM.  All such CLAIMS whenever made shall be considered first made on the date on which the earliest CLAIM was first made arising out of such WRONGFUL ACT, as defined in the applicable COVERAGE UNIT, and all such CLAIMS are subject to one "Per Claim Limit of Liability" and deducible.

Id. at ¶ 16; Westport Policy No. CTB-005415-3 [Doc. #1, Ex. D] at § X.

St. Paul's policy provided the following about the period of coverage:

**When this Agreement Covers**

---

[1] The Westport Policy provides: "The Company shall pay on behalf of any INSURED all LOSS and excess of the deductible which any INSURED becomes legally obligated to pay as a result of CLAIMS first made against any INSURED during the POLICY PERIOD and reported to the Company in writing during the POLICY PERIOD or within sixty (60) days thereafter by reason of any WRONGFUL ACT occurring on or after the RETROACTIVE DATE, if any."  See Complaint [Doc. # 1] at ¶ 14; Westport Policy No. CTB-005415-3 [Doc. #1, Ex. D] at § I.

2

> **During this agreement or the limited reporting period.**  We will apply this agreement to claims or suits for covered loss only when they are:
> - first made or brought against a protected person during the policy year and while this agreement is in effect; and
> - first reported to us during the policy year, or during the limited reporting period if it applies.

See Complaint [Doc. # 1] at ¶ 18.

The St. Paul Policy also provided:

> We will consider a claim or suit for covered loss to be first made or brought against you on the date that any protected person first received written notice of that claim or suit.
>
> We will also consider all claims or suits for covered loss caused by a wrongful act, or a series of related wrongful acts, to have been made or brought on the date that the first of those claims or suits is first made or brought.
>
> Series of related wrongful acts means two or more wrongful acts, including repeated or continuous wrongful acts, that are directly or indirectly related to the same loss.

Id. at ¶ 19.

St. Paul defended Briggs pursuant to its policy in the Amity suit, but denied coverage for the Munro and Symonds suits.  See id. at ¶ 20.  Subsequently, Westport agreed to defend Briggs in the Munro and Symonds suits under a reservation of rights, see id. at ¶21, but argues that it had no duty to defend because the Munro and Symonds suits arose out of the same or related wrongful acts alleged against Briggs in the Amity suit, and therefore both the St. Paul Policy and the Westport policy deem the claim to have been first made within the St. Paul policy period.  Westport states that it paid $100,000 in settlement of the Munro and

Symonds suits, and incurred costs in excess of $87,000 in defense of Briggs in these suits. It now seeks reimbursement from St. Paul for all defense and indemnity costs it incurred with respect to these suits. See id. at ¶ 24-25.

## II.  Standard

When deciding a 12(b)(6) motion to dismiss, the Court must accept all well-pleaded allegations as true and draw all reasonable inferences in favor of the pleader. Hishon v. King & Spalding, 467 U.S. 69, 73 (1984). A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. Swierkiewicz v. Sorema N.A., 534 U.S. 506, 513-14 (2002); Conley v. Gibson, 355 U.S. 41, 45-46 (1957). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974).

## III. Discussion

St. Paul argues that Westport, as the equitable subrogee of Briggs, is entitled to no greater rights than Briggs, and therefore cannot recover in a subrogation action because Briggs has not incurred any losses and has suffered no harm from St.

Paul.  In addition, St. Paul argues that Westport is not entitled to pursue a subrogation action because it acted as a "volunteer" in defending Briggs in the two lawsuits.

Equitable subrogation is "the mode which equity adopts to compel the ultimate payment of a debt by one who, in justice, equity, and good conscience, should pay it."  <u>Westchester Fire Ins. Co. v. Allstate Ins. Co.</u>, 236 Conn. 362, 371 (1996) (citations and internal quotation marks omitted).  This doctrine "is broad enough to include every instance in which one person, not acting as a mere volunteer or intruder, pays a debt for which another is primarily liable, and which is equity and good conscience should have been discharged by the latter."  <u>Id.</u>(citations and internal quotation marks omitted); <u>see also</u> <u>First Taxing Dist. v. Nat'l Surety Co.</u>, 97 Conn. 639, 642 (1922) (doctrine covers "one who, not as a volunteer or in his own wrong and where there are no outstanding and superior equities, pays the debt of another, is substituted to all the rights and remedies of the other, and the debt is treated in equity as still existing for his benefit.").  Thus in <u>Westchester Fire</u>, the Connecticut Supreme Court permitted an uninsured motorist insurance carrier that paid underinsured motorist benefits to its insured to bring a subrogation action against the tortfeasor's liability insurer who was alleged to have wrongfully denied coverage of the insured's claim against the tortfeasor.  In

5

Westchester Fire, as here, the insured was fully compensated and suffered no loss, and one insurer, as subrogee, sought reimbursement for payments that were alleged to be covered by another insurer.

Defendant has cited no authority supporting its narrower view of the equitable subrogation doctrine.  Contrary to defendant's contention, State v. Bloomfield Const. Co., 126 Conn. 349, 359-60 (1940), supports the broad scope of the doctrine.  In Bloomfield, after defending the state in an underlying tort action in which the state was found liable for $4000, Aetna Life Insurance Company, as subrogee, brought suit against the Bloomfield Construction Company claiming that the state was deprived of its statutory defense because the construction company failed to maintain a sign informing drivers that they were using the highway under construction at their own risk, as required under the state's contract with the construction company. The Bloomfield court found that the insurer, as subrogee of the state, could recover from the defendants for the damages suffered by the state because of the breach of contract.  See id. at 356 (concluding that insurer "is subrogated to the rights of the state and can recover from the defendants for the damages suffered by the state because of the breach of contract by the construction company . . .").

At best, Bloomfield may support a narrower proposition that

6

an insurer may not recover from a tortfeasor expenses incurred in defending the underlying suit.  As the Connecticut Supreme Court found:

> . . . the Aetna Life Insurance Company is here claiming merely by subrogation those rights which the state would have to recover and stands in its shoes.  As far as the record discloses, the state did not make any payments or incur any obligations on account of the defense of the Clement suit and would have no basis of recovery on that account. The insurance company, its subrogee, cannot, therefore, recover them.

Bloomfield, 126 Conn. at 359-60.

Bloomfield's treatment of defense expenses may be distinguished on its facts, however.  Westport's claim here is that St. Paul should have defended Briggs' in two lawsuits, and therefore was unjustly enriched by Westport's assumption of Briggs' defense.  Thus, unlike Bloomfield, the core of plaintiff's claim against St. Paul is its undertaking in defending the underlying lawsuit.  In this context, this Court declines to narrowly define the insured's debt as the settlement amount ultimately paid.  At the time the lawsuit was commenced against Briggs, the ultimate settlement amount was unknown; the debt owed by Briggs, therefore, may be viewed as the entire cost of defending the suit.  To hold otherwise would inappropriately create incentives for insurers in situations where two policies are in effect to decline coverage, because their maximum liability in a subrogation action would be limited.  See, e.g. Farmers Ins. Group v. Progressive Cas. Ins. Co., 269 N.W. 2d 647,

653 (Mich. App. 1978) (allowing excess insurer subrogation recovery for defense costs incurred because contrary ruling would "subsidize refusal to defend.").[2]

Defendant also argues that Westport's equitable subrogation action is not cognizable because it acted as a "volunteer" in defending the lawsuits against Briggs.  The rule that an insurer may not recover in a subrogation action if it pays a debt for which it is not liable is well-established.  See Westchester, 236 Conn. at 371 (doctrine of equitable subrogation covers instances "in which one person, not acting as a mere volunteer or intruder, pays a debt for which another is primarily liable . . . "); 16 Couch on Ins. § 223:25 ("[T]he payment must have been made under compulsion, or for the protection of some interest of the person making it in discharge of an existing liability which must be fully satisfied. . . .  Accordingly, an insurer which pays a loss for which it is not reasonably liable thereby becomes a mere volunteer, and is not entitled to subrogation, in the absence of an enforceable agreement therefor.")

Connecticut's lower courts are divided on the circumstances

---

[2]Of course, in the absence of contractual or statutory authorization, Westport would not be entitled to recover attorneys fees incurred in prosecuting the instant litigation against St. Paul.  See, e.g. Gionfriddo v. Avis Rent A Car Sys., Inc. 192 Conn. 280, 297 (1984) ("[A]bsent contractual or statutory authorization, there can be no recovery, either as costs or damages, for the expenses of litigation or the expenditures for counsel fees by a party from his opponent.") (citations and internal quotation marks omitted).

in which an insurer is deemed a volunteer.  In <u>Allstate Ins. Co. v. Leher</u>, No. X03cv950502559S, 2001 WL 85141 (Conn. Super. Jan. 16, 2001), the Connecticut Superior Court concluded that Allstate acted as a volunteer in paying a $1,100,000 settlement on behalf of its insured, Joseph Claffey, arising out of an incident in which Claffey drove his car into a woman and her three children, injuring one child.  Claffey admitted that he intentionally sought to run the family over, was criminally tried, and at trial was found not guilty by reason of mental disease or defect.  Allstate brought a subrogation action against Andre Lerer, Claffey's treating physician, alleging that Leher's negligent care of Claffey caused Claffey to injure the child.  The court invoked the prohibition against subrogation claims by a volunteer in denying Allstate's claim, holding that because Claffey's conduct was intentional and criminal, it was explicitly excluded from coverage under Allstate's policy.  <u>See</u> <u>id</u>. at *8.  The court acknowledged that Claffey's mental infirmity might have called into question whether his conduct was covered under the policy, but concluded that:

> [W]here there is a question as to whether conduct is covered under an insurance policy, an insurer who wishes to pursue a subrogation claim must wait for a court to adjudicate coverage.  If it makes a payment under the policy before such adjudication, it is deemed to have done so as a volunteer, and will not be subrogated for the amounts so paid.

<u>Id</u>. (citation omitted).

In contrast, American States Ins. Co. v. Allstate Ins. Co., No. cv970567571S, 2003 WL 22960369 (Conn. Super. Nov. 13, 2003), permitted plaintiffs to maintain an equitable subrogation action in the face of disputed coverage under the insurance policies, on grounds that American States was obligated to represent its insured only after Allstate, the primary insurer, breached its duty to defend. The court noted that "the duty to defend the action depends on whether the complaint in the action states facts which appear to bring the claimed injury within the policy coverage. If an allegation of the complaint falls even possibly within the coverage, then the insurance company must defend the insured." Id. at *1. After finding it undisputed that American States issued a personal umbrella insurance policy to the insured, the court concluded that the insured and excess carrier had the right "to settle a case in which the primary insurer wrongfully refused to contribute its policy limits." Id. at *2.

Given the absence of Connecticut Supreme Court authority on this issue, this Court "must make an estimate of what the state's highest court would rule to be its law." Cunninghame v. Equitable Life Assur. Soc. of U.S., 652 F.2d 306, 308 (2d Cir. 1981). The Connecticut Supreme Court has broadly defined an insurer's duty to defend, so that "[i]f an allegation of the complaint falls even possibly within the coverage, then the insurance company must defend the insured." Imperial Cas. and

10

Indem. Co. v. State of Connecticut, 246 Conn. 313, 324 (1998) (citations and internal quotation marks omitted) (alterations in original).  The rule adopted in Leher appears inconsistent with such an encompassing duty to defend, as it would discourage insurers' from defending their insured where there is a dispute over coverage, or would protract and delay the resolution of a claim against an insured by requiring court adjudication of coverage prior to payment of a claim.  Thus, this Court believes that the Connecticut Supreme Court would permit subrogation actions where an insurer pays a loss for which it reasonably may be liable, even if its obligation under its policy is in dispute.  See 16 Couch on Ins. § 223:27 ("[I]nsurance payment is not voluntary if it is made with reasonable or good faith belief in obligation or personal interest in making that payment.  This standard is met when an insurer has acted in good faith to discharge a disputed obligation, even if it is ultimately determined that its insurance policy did not apply.").

Several states have adopted this narrower view of voluntariness and permit subrogation actions brought after the payment of a claim which was the subject of dispute between insurers as to which of them was responsible. For example, in State Farm Mut. Auto. Ins. Co. v. Northwestern, 912 P.2d 983, 986 (Utah 1996), the Supreme Court of Utah found that "State Farm did have a legal interest of its own to protect by investigating and

11

settling the claim and therefore was not a volunteer," where a dispute existed between State Farm and Northwestern as to which policy covered the insured's accident.  As the Utah court noted, such a standard encourages early settlement and protects the insured, who otherwise would have been "forced to rely on his own resources, even though premiums had been paid to protect against loss from such an accident."  Id.  Likewise, in American Gen. Fire & Cas. Co. v. Progressive Cas. Co., 799 P.2d 1113, 1117 (N. Mex. 1990), the Supreme Court of New Mexico found that American General was not acting as a volunteer in defending its insured where the complaint against its insured appeared on its face to implicate the policy coverage, even though it later came to believe that the claim would not be covered under its policy, because "Progressive's own inaction in failing to provide a defense forced American General to continue its representation."  See also Jamestown Mut. Ins. Co. v. Nationwide Mut. Ins. Co., 176 S.E.2d 751, 755-56 (N.C. 1970) ("Jamestown defended because Nationwide refused to do so. Jamestown defended in good faith as Jamestown would have been liable had it been adjudged that Nationwide's policy did not provide coverage for [the insured]. Under these circumstances, Jamestown was not such a pure volunteer as to be deprived of the right of subrogation.").

    Here, Westport's complaint alleges that it agreed to defend Briggs under a reservation of rights, and there is a genuine

dispute about whether St. Paul had an obligation to defend and indemnify Briggs. Although Westport now argues that its policy did not cover Briggs' claim because the first lawsuit was brought within the policy period of the St. Paul Policy and the subsequent suits arose from the same wrongful act, the two 2003 suits against Briggs that Westport defended were claimed within Westport's policy period, and Westport thus was exposed to potential liability under its policy. Particularly in view of the broad scope of the duty to defend under Connecticut law, see, e.g., Imperial Cas., 246 Conn. at 324, Westport cannot be deemed a volunteer in undertaking her defense after St. Paul denied coverage.

**IV.  Conclusion**

For the foregoing reasons, defendant's motion to dismiss [Doc. # 13] is DENIED.

IT IS SO ORDERED.

/s/

Janet Bond Arterton, U.S.D.J.

**Dated at New Haven, Connecticut, this 14th day of June, 2005.**